Michael R. Lozeau (State Bar No. 142893)
Douglas J. Chermak (State Bar No. 233382)
E-mail: michael@lozeaudrury.com
           doug@lozeaudrury.com
LOZEAU DRURY LLP
410 12th Street, Suite 250
Oakland, CA 94607
Tel: (510) 836-4200
Fax: (510) 836-4205

Alicia Roessler (State Bar No. 219623)
Margaret Hall (State Bar No. 293699)
Email: aroessler@EnvironmentalDefenseCenter.org
           mhall@EnvironmentalDefenseCenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, California  93101
Tel: (805) 963-1622
Fax: (805) 962-3152

Attorneys for Plaintiff
ENVIRONMENTAL DEFENSE CENTER

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a non-profit corporation, <br><br> Plaintiff, <br><br> vs. <br><br> PACIFIC COAST ENERGY COMPANY LP, a limited partnership, <br><br> Defendant. | Case No.  _____ <br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES <br><br> (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

COMPLAINT

ENVIRONMENTAL DEFENSE CENTER ("EDC"), a California non-profit association, by and through its counsel, hereby alleges:

## I.   **JURISDICTION AND VENUE**

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the Act").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.      On April 17, 2018, Plaintiff provided notice of Defendant's violations of the Act, and of Plaintiff's intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Central Coast Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of EDC's notice letter is attached as Exhibit A, and is incorporated by reference.

3.      More than sixty days have passed since notice was served on Defendant and the State and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Central District of California pursuant to Section

COMPLAINT

505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.   **INTRODUCTION**

5.     This complaint seeks relief for Defendant's discharges of polluted storm water and non-storm water pollutants from Defendant's Orcutt Hill oil and gas field located at 1555 Orcutt Hill Road in Orcutt, California ("Orcutt Hill" or "Facility") in violation of the Act and California's General Permit for Storm Water Discharges Associated With Industrial Activities, National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board ("State Board") Water Quality Order No. 2015-0057-DWQ ("General Permit"). Defendant's violations of the discharge, treatment technology, monitoring requirements, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

## III.   **PARTIES**

6.     Plaintiff EDC is a California non-profit corporation and law firm with its principal place of business located at 906 Garden Street, Santa Barbara, CA 93101. EDC was founded in 1977 and is dedicated to the preservation and enhancement of the local environment through education, advocacy, and legal action.  EDC represents itself and other organizations in protecting coast and ocean resources, open spaces and wildlife, and human and environmental health.  EDC has approximately 3,000 members, including scientists, lawyers, students and citizens who live, recreate, and work in and around waters of the State of California, including creeks flowing near the Orcutt Hill oil and gas field.  EDC was formed to empower local citizens "to protect themselves and their communities" by serving as "the legal action arm of the environmental community."  EDC brings this action on behalf of its members.  EDC's interests in reducing Defendant's discharges of pollutants into coastal rivers and creeks, the Pacific Ocean and coastal creeks flowing into the Ocean and requiring

COMPLAINT

Defendant to comply with the requirements of the General Permit are germane to its purposes.  Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of EDC.

7.      Members of EDC reside in coastal communities that value and depend upon the Pacific Ocean, as well as the surface waters which eventually flow into the ocean.  The Orcutt Hill oil and gas field is located near the San Antonio Creek and Orcutt Creek.  San Antonio Creek flows into the Pacific Ocean.  Orcutt Creek flows into the Santa Maria River and then into the Pacific Ocean.  Members of EDC use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.  Plaintiff's members use these areas to swim, bird watch, boat, sail, kayak, surf, view wildlife, fish, and engage in scientific study including monitoring activities, among other things.  Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of Plaintiff's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the General Permit.  The relief sought herein will redress the harms to Plaintiff caused or contributed to by Defendant's activities.

8.      Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and one or more of its members, for which harm they have no plain, speedy or adequate remedy at law.

9.      Defendant Pacific Coast Energy Company LP ("PCEC") is a limited partnership organized under the laws of Delaware.  PCEC is an independent energy company headquartered in Orcutt, California, focused on the acquisition and development of oil and gas resources in California.

**IV.    STATUTORY BACKGROUND**

10.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance

COMPLAINT

with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

11.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(p).

12.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

13.     The State Board elected to issue a statewide general permit for industrial storm water discharges.  The State Board originally issued the General Permit on or about November 19, 1991.  The State Board modified the General Permit on or about September 17, 1992.  Pertinent to this action, the State Board reissued the General Permit on or about April 17, 1997, and again on or about April 1, 2014, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

14.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.  33 U.S.C. § 1311(a).

15.     The General Permit contains several prohibitions.  Effluent Limitation V(A) requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Discharge Prohibition III(C) prohibits storm water discharges and authorized non-

storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation VI(B) prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation VI(A) and Discharge Prohibition III(D) prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

16.    In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

17.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP").  The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The General Permit requires that an initial SWPPP has been developed and implemented before October 1, 1992.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges.  *See* General Permit § X(C).  These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.  To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary.  General Permit § X(B).  Failure to develop or implement an adequate SWPPP, or

COMPLAINT

update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit Fact Sheet § I(1).

18.     Section X of the General Permit sets forth the requirements for a SWPPP.  Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective. The General Permit also requires all dischargers to develop and implement a set of minimum BMPs, as well as any advanced BMPs as necessary to achieve BAT/BCT, which serve as the basis for compliance with the General Permit's technology-based effluent limitations and receiving water limitations.  *See* General Permit § X(H).  The General Permit requires dischargers to implement and maintain, to the extent feasible, all of the following minimum BMPs in order to reduce or prevent pollutants in industrial storm water discharges: good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, an employee training program, and quality assurance and record keeping.  *See* General Permit § X(H)(1).  Failure to implement all of these minimum BMPs is a violation of the General Permit.  *See* General Permit Fact Sheet § I(2)(o).  The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  *See* General Permit § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.

*Id.*  The General Permit also requires that the SWPPP include BMP descriptions and a BMP summary table.  *See* General Permit §§ X(H)(4), (5).

19.     The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program.  The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.  As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  The General Permit mandates that facility operators sample four storm water discharges from all discharge locations from a facility over the course of the reporting year.  *See* General Permit §§ XI(B)(2), (3).

20.      Facilities are required to make monthly visual observations of storm water discharges.  The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  General Permit § XI(A).

21.     Under the General Permit, facilities must analyze storm water samples for "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment."  General Permit § XI(B)(6)(c).

22.     The General Permit does not provide for any mixing zones by dischargers.  The General Permit does not provide for any receiving water dilution credits to be applied by dischargers.

23.     The Regional Board has established water quality standards for the Santa Maria River, San Antonio Creek, and Orcutt Creek Watersheds in the "Water Quality Control Plan for the Central Coast Basin," generally referred to as the Basin Plan.

24.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations which are toxic to, or that produce detrimental physiological responses in, human, plant, animal, or aquatic life."

25.     The Basin Plan provides that "[w]aters shall not contain settleable material in concentrations that result in deposition of material that causes nuisance or adversely affects beneficial uses."

26.     The Basin Plan provides that "[w]aters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses."

27.     The Basin Plan has a narrative oil and grease standard which states that "[w]aters shall not contain oils, greases, waxes, or other similar materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses."

28.     The Basin Plan provides that "[w]aters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses."

29.     The Basin Plan provides that "[t]he suspended sediment load and suspended sediment discharge rate of surface waters shall not be altered in such a manner as to cause nuisance or adversely affect beneficial uses."

30.     The Basin Plan provides that "[w]aters shall not contain floating material, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses."

31.     The Basin Plan provides that "[w]aters shall be free of coloration that causes nuisance or adversely affects beneficial uses."

32.     For waters with a beneficial use of cold freshwater habitat, the Basin Plan provides that "[t]he pH value shall neither be depressed below 7.0 nor raised above 8.3."

COMPLAINT

33.     EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.  The following EPA benchmarks have been established for pollution parameters applicable to Orcutt Hill: pH—6.0-9.0 s.u.; total suspended solids ("TSS")—100 mg/L; and oil and grease ("O&G")—15 mg/L.

34.     These benchmarks are reflected in the General Permit in the form of Numeric Action Levels ("NALs").  The General Permit incorporates annual NALs, which reflect the EPA's 2008 Multi-State General Permit benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.  The following annual NALs have been established under the General Permit: TSS—100 mg/L; and O&G—15 mg/L.  An exceedance of annual NALs occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL.  The reporting year runs from July 1 to June 30.  The General Permit also establishes the following instantaneous maximum NALs: pH—6.0-9.0 s.u.; TSS—400 mg/L; and O&G—25 mg/L.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs necessary to prevent future NAL exceedances.  If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due

COMPLAINT

to the presence of the pollutant in the natural background.

35.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $52,414 for violations occurring after November 2, 2015; and up to $37,500 per day per violation occurring since October 28, 2011, up to and including November 2, 2015, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365.  *See also* 40 C.F.R. §§ 19.1 - 19.4.

## V.     STATEMENT OF FACTS

36.     Defendant PCEC owns and/or operates the Orcutt Hill oil and gas facility, located on 6,000 acres in the northern section of Santa Barbara County.

37.     Orcutt Hill falls within SIC Code 1311 (crude petroleum & natural gas). The SIC Manual defines SIC code 1311 as including "[e]stablishments primarily engaged in operating oil and gas field properties. Such activities may include exploration for crude petroleum and natural gas; drilling, completing, and equipping wells; operation of separators, emulsion breakers, desilting equipment, and field gathering lines for crude petroleum; and all other activities in the preparation of oil and gas up to the point of shipment from the producing property." *Available at*: https://www.osha.gov/pls/imis/sic_manual.display?id=387&tab= description.  On information and belief, EDC alleges that the industrial activities conducted at the Orcutt Hill oil and gas field include crude oil and natural gas production; seep cans; crude oil separation, storage, and transfer to pipelines; natural gas treatment and reuse; produced water storage and injection; well drilling; acidizing; well completion and stimulation; above ground storage tanks and vessels; outdoor solid materials storage; and maintenance activities, including road maintenance.

COMPLAINT

38.     Based on the Facility's NOI and SWPPP, review of aerial photography, and EDC's information and belief, storm water is collected and discharged from the 5,400-acre oil and gas field through a diverse range of point sources dispersed throughout the field.

39.     For example, PCEC continues to maintain an extensive road system throughout the Orcutt Hill oil and gas field.  According to EDC's information and belief, and the review of aerial photographs, numerous erosion gullies and channels caused by runoff from the Facility's roads exist throughout the Facility.  These roads and erosion gullies discharge substantial quantities of sediment, turbidity, TDS, and other pollutants to the creeks within the oil and gas field and subsequently Orcutt Creek, San Antonio Creek, and flow into the Santa Maria River and the Pacific Ocean.  Numerous landslides with erosion gullies and channels have also resulted from the Facility's construction and maintenance of roads, drilling pads, thermal injection activities, and other features that have undercut adjacent hillsides and caused caving and landslides and subsequent erosion channels.

40.     Defendant channels and collects storm water falling on the Facility through a series of channels that lead to at least nine storm water outfalls.  Storm water from the various point sources within the Orcutt Hill oil and gas field is eventually discharged to channels that flow either into tributaries that flow to San Antonio Creek or into tributaries that flow to Orcutt Creek.  Orcutt Creek flows into the Santa Maria River.

41.     As stated by the EPA, "oil, gas and mining facilities are among those industrial sites that are likely to discharge storm water runoff that is contaminated by process wastes, toxic pollutants, hazardous substances, or oil and grease," and that "such contamination can include disturbed soils and process wastes containing heavy metals or suspended or dissolved solids, salts, surfactants, or solvents used or produced in oil and gas operations."  *NPDES Permit Application Requirements for*

*Storm water Discharges*, 55 Fed. Reg. 47,990 at p. 55-56 (Nov. 16, 1990).  EPA notes that because oil and gas operations [such as the Orcutt Hill oil and gas field] "have the potential for serious water quality impacts, Congress recognized . . . the need to control storm water discharges from oil, gas, and mining operations."  *Id.*

42.     Plaintiff is informed and believes, and thereupon alleges that the storm water flows over the surface of the Facility's industrial features, collecting suspended sediment, dirt, and other pollutants as it flows towards the Facility's storm water outfalls, which discharge into channels that flow untreated either into San Antonio Creek, or into Orcutt Creek and then the Santa Maria River.

43.     On information and belief, Plaintiff alleges that the majority of storm water discharges from the Facility contain storm water that is commingled with runoff from areas at the Facility where industrial processes occur.

44.     Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Orcutt Hill oil and gas field are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.  The Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent rainfall and storm water flows from coming into contact with exposed areas of contaminants.  The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated.  The Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated.

45.     Since at least February 10, 2017, PCEC has taken samples or arranged for samples to be taken of storm water discharges at the Facility.  The sample results were reported by the Facility in uploads to the State Board's Stormwater Multiple Application and Report Tracking System ("SMARTS").

46.     The Facility has consistently reported high pollutant levels of TSS from its sampling results in nearly all of its storm water sampling locations.

47.     The Facility has reported numerous discharges in excess of narrative and numeric water quality standards established in the Basin Plan.  These observations have thus violated narrative and numeric water quality standards established in the Basin Plan and have thus violated Discharge Prohibitions III(C) and III(D) and Receiving Water Limitations VI(A) and VI(B) of the General Permit, and are evidence of ongoing violations of Effluent Limitation V(A) of the General Permit.  On February 20, 2017, the Facility observed turbidity in storm water discharged from Sampling Locations #2, 6, and 7.  On March 21, 2017, the Facility observed turbidity in storm water discharged from Sampling Locations #1, 2, and 7.  On January 9, 2018, the Facility observed turbidity in storm water discharged from the Main Facilities Culvert and Pipe Yard Surface Runoff sampling locations.  On March 13, 2018, the Facility observed turbidity in storm water discharged from Sampling Location #1.  On March 21, 2018, the Facility observed turbidity in storm water discharged from the Field Welders, Dome 19, Main Facilities, Pipe Yard, Fueling Area, Folsom 9, Pinal Tank Farm, and Pinal 7 sampling locations.  These discharges violate the narrative standard set forth in the Basin Plan for turbidity.  On January 9, 2018, the Facility observed oil and grease in storm water discharged from the Pipe Yard Surface Runoff sampling location, which violates the narrative standard set forth in the Basin Plan for oil and grease.  On March 21, 2017, the Facility measured a storm water discharge with a pH levels of 6.91 from Sampling Location #7, which is in violation of the water quality standard for pH set forth in the Basin Plan.

48.     The levels of TSS in storm water detected by the Facility have exceeded the benchmark value and annual NAL for TSS of 100 mg/L established by EPA and the State Board, respectively, and the instantaneous maximum NAL value for TSS of 400 mg/L established by the State Board.  For example, on March 21, 2017, the level of TSS measured by Defendant at one of its outfalls was 2,800 mg/L.  That level of TSS is 28 times the benchmark value and annual NAL for TSS, and four times the

COMPLAINT

14

instantaneous maximum NAL for TSS.  PCEC also has measured levels of TSS in storm water discharged from the Facility in excess of 100 mg/L in nearly every discharge from the Facility measured since it has received coverage under the General Permit, including the following dates: March 21, 2018; March 13, 2018; January 9, 2018; March 21, 2017; and February 10, 2017.  In addition, PCEC has measured levels of TSS in storm water discharged from the Facility in excess of 400 mg/L in three sampling results during the 2017-2018 reporting year and in every sampling result during the 2016-2017 reporting year.  Specific dates on which PCEC has measured such exceedances, and the levels and locations of such exceedances, are contained in the Notice Letter attached as Exhibit A.

49.    EDC is aware that PCEC has filed documents with the State Board noting that the sources of TSS at the Facility are not from industrial activities at the Facility but are more likely naturally occurring.  The General Permit includes "Natural Background Pollutant Source Demonstration" as a category of "Exceedance Response Actions ("ERAs")".  General Permit,§ XII(D)(2)(c).  In order to qualify as an ERA under this category, the discharger must meet nine requirements, including the fundamental requirement to show that the pollutant exceedance (in this case, TSS) is "attributable *solely* to the presence of the pollutant in the natural background that has not been disturbed by industrial activities."  On information and belief, EDC alleges that PCEC has not made this demonstration, and accordingly is not exempt from TSS effluent limitation requirements under the General Permit.  PCEC is responsible for runoff from disturbed areas at the Facility, as these areas have the potential to contribute to sediment runoff.

50.    During the 2015-2016 reporting year, and during the first half of the 2016-2017 reporting year, the Facility failed to collect and analyze any storm water discharge samples.  On information and belief, EDC alleges that there were sampling opportunities during these reporting periods for the Facility to conduct the required

1    sampling and analysis.

2       51.    On information and belief, EDC alleges that PCEC failed to sample from

3    all nine sampling locations at the Facility during the 2015-2016 and 2016-2017

4    reporting years.  The samples taken in 2017 were only from four different sampling

5    locations at the Facility, and PCEC has represented that there are at least nine storm

6    water sampling locations at the Facility.

7       52.    On information and belief, EDC alleges that PCEC has failed to monitor

8    for a number of pollutants in storm water discharges at the Facility, including but not

9    limited to total petroleum hydrocarbons, chemical oxygen demand, chlorides, barium,

10   naphthalene, phenanthrene, benzene, lead, arsenic, fluoride, acetone, toluene, ethanol

11   xylenes, barium, antimony, aluminum, zinc, antimony, copper, mercury, and nickel.

12      53.    On information and belief, EDC alleges that PCEC has failed to complete

13   an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") for

14   the 2016-2017 reporting year in compliance with Section XV of the General Permit.

15      54.    On information and belief, Plaintiff alleges that since July 15, 2015,

16   PCEC has failed to implement BAT and BCT at the Facility for its discharges of TSS,

17   pH, and other un-monitored pollutants.  Effluent Limitation V(A) of the General

18   Permit requires that PCEC implement BAT for toxic and nonconventional pollutants

19   and BCT for conventional pollutants by no later than October 1, 1992, or the date that

20   the Facility first received coverage under the General Permit.  As of the date of this

21   Complaint, PCEC has failed to implement BAT and BCT.

22      55.    On information and belief, Plaintiff alleges that since July 15, 2015,

23   PCEC has failed to implement an adequate SWPPP for the Facility.  Plaintiff is

24   informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility

25   does not set forth site-specific best management practices for the Facility that are

26   consistent with BAT or BCT for the Facility.  Plaintiff is informed and believes, and

27   thereupon alleges, that the SWPPP prepared for the Facility does not include an

28

adequate assessment of potential pollutant sources, including information such as an identification of the Facility's road network as a pollutant source; and fails to implement and maintain requisite advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water discharge in a manner that reflects best industry practice considering BAT/BCT.  According to information available to EDC, PCEC's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges.

56.     On or about September 29, 2017, PCEC submitted a "Storm Water Level 1 ERA Report" to the State Board's SMARTS system.  On or about June 11, 2018, PCEC submitted a revised "Storm Water Level 1 ERA Report" to the State Board's SMARTS system.  PCEC's ERA Level 1 report addresses the Facility's exceedance of the NAL for TSS during the 2016-2017 reporting year.   Although the report addresses TSS, PCEC failed to identify sufficient additional BMPs necessary to prevent future NAL exceedances or to comply with BAT/BCT requirements of the General Permit.  The report fails to address any TSS exceedances associated with the Facility's extensive road network.  The failure of the ERA to include sufficient additional BMP measures identified could not and has not helped PCEC to achieve the applicable NALs for TSS.

57.     Information available to EDC indicates that PCEC is discharging storm water containing excessive pollutants during rain events to channels that flow to either San Antonio Creek or into Orcutt Creek and then into the Santa Maria River.

58.     Plaintiff is informed and believes, and thereupon alleges, that PCEC has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with the General Permit.

59.     Information available to Plaintiff indicates that PCEC has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and

believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## VI. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Failure to Implement the Best Available and
Best Conventional Treatment Technologies
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

60. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

61. The General Permit's SWPPP requirements and Effluent Limitation V(A) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. PCEC has failed to implement BAT and BCT at the Facility for its discharges of TSS, pH, and other un-monitored pollutants in violation of Effluent Limitation V(A) of the General Permit.

62. Each day since July 15, 2015, that PCEC has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

63. PCEC has been in violation of the BAT/BCT requirements every day since July 15, 2015. PCEC continues to be in violation of the BAT/BCT requirements each day that they fail to develop and fully implement BAT/BCT at the Facility.

### SECOND CAUSE OF ACTION
**Discharges of Contaminated Storm Water
in Violation of Permit Conditions and the Act
(Violations of 33 U.S.C. §§ 1311, 1342)**

64. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

65.     Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

66.     Plaintiff is informed and believes, and thereupon alleges, that since at least March 20, 2017, PCEC has been discharging polluted storm water from the Facility in excess of applicable water quality standards in violation of Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit.

67.     During every rain event, storm water flows freely over exposed materials, disturbed portions of earth, and other accumulated pollutants at the Facility, becoming contaminated with sediment, pH-altering substances, and other un-monitored pollutants at levels above applicable water quality standards.  The storm water then flows untreated to channels that flow to either San Antonio Creek or into Orcutt Creek and then into the Santa Maria River.

68.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit.

69.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation VI(B) of the General Permit.

COMPLAINT

70.     Every day since at least March 20, 2017, that PCEC has discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

**THIRD CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

71.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

72.     The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992, or since the date a facility first received coverage under the General Permit.

73.     PCEC has failed to develop and implement an adequate SWPPP for the Facility.  PCEC's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, PCEC's failure to include an adequate assessment of potential pollutant sources, and failure to implement and maintain requisite advanced BMPs.

74.     PCEC has failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring.

75.     Each day since July 15, 2015, that PCEC has failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

76.     PCEC has been in violation of the SWPPP requirements every day since July 15, 2015.  PCEC continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

### FOURTH CAUSE OF ACTION
**Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

77.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

78.     The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992, or since the date a facility first received coverage under the General Permit.

79.     PCEC has failed to develop and implement an adequate monitoring and reporting program for the Orcutt Hill oil and gas field.

80.     PCEC's ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by, *inter alia*, its failure to sample from all nine sampling locations at the Facility during the 2015-2016 and 2016-2017 reporting years, and its failure to monitor storm water discharges for chemicals likely to be present in the Facility's discharges.

81.     Each day since July 15, 2015, that PCEC has failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

///

///

///

COMPLAINT

**FIFTH CAUSE OF ACTION**
**Failure to Comply with General Permit Evaluation**
**and ERA Requirements**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

82.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

83.     The ERA Level 1 report must, among other requirements, "[i]dentify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of this General Permit."  General Permit, § VII.C.1.c.

84.     The additional BMPs identified in PCEC's revised ERA Level 1 report, coupled with the existing protection and other measures identified in the Facility's SWPPP, are insufficient to prevent future NAL exceedances.  Nor are those measures sufficient to achieve the General Permit's BAT/BCT requirement.

85.     Each day since at least September 29, 2017, that Defendants have failed to develop and implement an adequate ERA Level 1 report in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Every day an adequate ERA report is absent is an ongoing and continuous violation of the Act.

**VII.   RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   Declare PCEC to have violated and to be in violation of the Act as alleged herein;

b.   Enjoin PCEC from discharging polluted storm water from the Facility unless authorized by the General Permit;

COMPLAINT

22

c.  Enjoin PCEC from further violating the substantive and procedural requirements of the General Permit;

d.  Order PCEC to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.  Order PCEC to immediately implement storm water pollution control and treatment technologies and measures that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

f.  Order PCEC to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

g.  Order PCEC to prepare a SWPPP consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

h.  Order PCEC to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

i.  Order PCEC to pay civil penalties of up to $37,500 per day per violation for each violation of the Act since October 28, 2011, up to and including November 2, 2015, and up to $52,414 for violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

j.  Order PCEC to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

k.  Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

///

///

COMPLAINT

l.   Award any such other and further relief as this Court may deem appropriate.

Dated: July 12, 2018                        Respectfully submitted,

LOZEAU DRURY LLP

By:    _/s/ Douglas J. Chermak_____
Douglas J. Chermak

ENVIRONMENTAL DEFENSE CENTER

_/s/ Alicia Roessler_ (as authorized on 7/12/18)
Alicia Roessler

_/s/ Margaret Hall_ (as authorized on 7/12/18)
Margaret Hall

COMPLAINT

24